Moncure, P.
delivered the opinion of the court. After stating the case he proceeded as follows :
The errors in the decree assigned in the petition for the appeal are, 1st. Because the bank was the agent of the plaintiff, authorized' by law to receive payment of the said notes, and if the plaintiff has any remedy, it is against the bank. And 2dly. If the petitioners are-liable, it can only be after the remedy against the bank, *382 and then, if necessary, that against Gwathmey and Fisher are exhausted. In the argument it was also that the remedy against the trustee A. D. must be exhausted before the appellants or the ¡and foy them can be made liable. We will now proceed to consider these assignments of error.
1st, That the bank was the agent of the plaintiff, authorized by law to receive payment of the said notes, and if the plaintiff has any remedy it is against the bank.
It was proved in the cause by Bobert A. Payne, that on the 14th of September 1863, he, as receiving teller of the bank, received the amount of the two protested notes aforesaid, in Confederate currency, from A. I). Williams, trustee, and placed the amount to the credit of B. F. Bogers on the books of the bank; that it was the usage of the Farmers Bank of Virginia in which the witness was employed, and he believes of all the banks, that if notes deposited in bank for collection were not paid at maturity, they were noted or protested and handed over to the note clerk, and there they remained until the maker or endorser called and paid them, or the holder withdrew them. If the holder did not withdraw them and gave no instructions to the contrary, it was the usage of the banks to receive payment of such notes at any time when payment was offered. This usage was long and well established and was generally known to customers of the banks and persons having business with them. Confederate currency, so far as the knowledge of the witness extended, was universally received by the banks in Bichmond during the war, in payment of notes held by said banks, either for their own benefit or for collection; and he thinks this usage of the banks was so general and so widely known, as to be familiar with their customers and those having business with or through them. He did not know that the notes were well secured by *383 deed of trust on real estate in Sydney ample to secure , . , their payment m good, money.
A bank at which a negotiable note. is payable, at which it is deposited for collection, is of course the agent of the holder or depositor to receive the money if paid at such bank at the maturity of the note, and, though not then paid, has no doubt implied authority to receive the money at any time thereafter and while the note remains at the bank. It very often happens that such a note is taken up at bank shortly after the protest thereof; and with a view to save the credit of the debtor; and it therefore very often happens that a protested note is suffered by the owner to remain at bank some time after protest, with a hope that it may be thus taken up. It does not often happen that a protested note is left very long at bank, especially when the debtor can be made to pay it, or the creditor has a deed of trust or other security, which he can enforce for its payment. There is then no motive for leaving the note at bank, but a strong one for taking it away. Still, however long, and with whatever motive, a protested note may be permitted by the owner to remain at bank, it may, as a general rule, be safely paid to the bank by the debtor, provided he has no notice that the bank in fact has no authority to receive the money. In regard to notes deposited at a bank for collection during the war, when Confederate money was the only currency, they might, properly, have been paid in such money, at least without notice that other money was demanded. To have made such a deposit without such a notice, could have been for no other purpose and with no other expectation than to get Confederate money. In regard to notes payable at bank before the war, deposited for collection, and protested for nonpayment, but neglected to be withdrawn from bank by the owner, residing in this State, it might be very questionable whether, after the lapse of two or three years, *384 the bank would have authority to receive payment of such notes in a currency which came into existence afthe protest of the note, and which, at the time of paymen^ depreciated in value as 12 to 1 compared with specie, in which payment might legally have been demanded; or whether the debtor, having notice of the facts, could make a valid payment of the note in such a currency and under such circumstances. It might not be reasonable to infer an authority to receive payment in such a currency under such circumstances, from the mere omission to withdraw the notes from the bank.
But however that may be, the case we have under' consideration is a very different case from any that has been stated. Here B. F. Rogers, the payee and the owner of the notes in question, was a non-resident of Virginia and a resident of the State of Kentucky when the notes were drawn, and when the deed of trust was executed for their security, and he has ever since resided in the State of Kentucky. The fact that he resided there is expressly stated in the deed of trust, which was duly recorded, and was no doubt notorious to all the parties concerned. The notes were deposited by him for collection at bank long before the war; one of them became due, and was protested in November 1860, nearly six months before the war, and the other became due, and was protested in May 1861, just after the war commenced; at that time Confederate money had not become the currency of this country. The notes could not well, if possibly, have been withdrawn from the bank by B. F. Rogers after the protest of the last note and before the end of the war. Kentucky, where he lived, was one of the United States, and he was separated from Richmond “ by a line of bayonets.” There were certainly instances, and perhaps many of them, in which that line was crossed; and the record shows that two of his brothers and *385 several of his nephews, residing in the same county with him, visited Richmond during the war; though it does not appear that he had any knowledge of the visit. At all events, there was so much difficulty and so much danger in the communication between the two places, which was expressly prohibited by the law of the government under which he lived, that he cannot be held accountable for not having withdrawn these notes from bank after the war commenced; nor can any inference be fairly drawn from that fact, that he authorized the bank to receive, and the debtor to pay, the amount of these protested notes in September 1863, in a currency depreciated to the degree of 12 to 1, as compared with specie, when the notes were payable in specie, and were secured by a deed of trust on real estate, exceeding in value the amount of the notes. What motive could B. 3?. Rogers have been supposed to have for making such a sacrifice? A. D. Williams knew when he took up the notes that they did not belong to the bank, but belonged to B. 3?. Rogers, a non-resident of the State and of the Confederate States, by whom they had been deposited before the war only for collection. He knew they were perfectly secured by a deed of trust on real estate. His only object in taking up the notes was to obtain a release of that deed of trust. It was a means to an end. The equity of redemption, in the property conveyed by that deed, was included in the subsequent deed of trust to him under which he had made a sale of the very property bound by the prior deed, and he wished to free the property from that incumbrance, so as to be able to make a good title to the purchasers from him. He made his sale on the 17th of April 1863, just five months before he took up the notes, when the deed of trust for the benefit of Rogers was on record and in full force. Instead of going to the bank and taking up the notes by the payment of the amount in Confederate money, he ought to have gone to the trus *386 tees in the said deed of trust, and learned of them the terms on which he could obtain a release. He did go to the trustees, but after he had taken up the notes, and then he carried with him a deed already drawn for execution by them, which, of course, they refused to execute without authority from the creditor.
We therefore concur in the opinion of the Circuit court, that the bank had no authority to receive payment of the .notes in depreciated Confederate currency; that A. D. Williams had no right to make such a payment; that the said payment was not a valid one; that the notes still belong to B. F. Rogers, notwithstanding such payment, and that the deed of trust for his benefit-is still a subsisting security, in full force and effect. And this disposes of the first assignment of error, except the latter branch of it; “ that” if the plaintiff has any remedy it is against the bank. Certainly the hank is liable to somebody for the value of the Confederate money which it received, and B. F. Rogers might, if he chose, elect to enforce that liability, though not perhaps without giving up his right to the notes, and under the deed of trust. The ground he takes is, that the bank had no authority to receive the payment, and that it was a void act. By seeking to enforce, it, he might make it a valid act. At all events, he is not bound to proceed' against the bank, whatever may he its liability. The unlawful act of the bank and of A. D. Williams cannot deprive B. F. Rogers of his plain and simple remedy under his deed of trust, and involve him in a troublesome and expensive pursuit of a bankrupt corporation.
, 2dly. It is insisted by the appellants that if the property held by them as aforesaid be liable to satisfy the demand of Rogers, it can only he after the remedies therefor against the hank, A. D.. Williams, G-wathmey and Fisher, respectively, are exhausted.
We have already disposed of the supposed remedy *387 against the bank, and shown that it can interpose no obstruction to the right of Eogers to proceed directly against the property subject to his deed of trust. And the other supposed remedies, to wit, against A. D. Williams, Gwathmey and Fisher, may be disposed of in the same way. Eogers came into court, claiming that his debt was still due and his deed of trust for its security in full force, notwithstanding what had occurred as aforesaid, and asking that the trusts of the deed might be executed for his benefit. We think that his claim is well founded, and his right to what lie asks for is the legitimate consequence. If the protested notes had not been taken up by A. I). Williams as aforesaid, Eogers would have had no difficulty in having the trusts of his deed executed, without coming into court for that purpose. But an obstacle was thrown in his way by the intromission of A. D. Williams, and he had to come into court to -remove that •obstacle. Having removed it, he stands at least on as high ground as if it had never been thrown in his way. He did not ask for a pei-sonal decree against his debtor Green, or any body else, but only for the enforcement of the deed of trust by a sale of the property thereby conveyed, or so much of it as might be necessary for the payment of the debt. It was proper for him to make the terre tenants of the property, or portions of it, claiming title thereto under alienations subsequent to the said deed of trust, defendants to his suit, as they had an interest in the subject in controversy; and it was proper for the court, in decreeing a sale of the property to satisfy the debt, to direct it to be sold in such order as would best consist with the rights of all the parties and the justice of the case. The trust creditor had a right to have the trust property sold for the payment of the trust debt, notwithstanding the subsequent alienations; but he had not a right to have it sold in any certain order, not affecting the security *388 of the debt.' The order of selling it, provided it be without prejudice to the rights of the trust creditor, is subject to the equitable control of the court. ^ piainti£f cannot be required to take a pergonal decree against any of the defendants. He cannot be delayed or embarrased by the prosecution of any of their rights or remedies “inter se. He has put no such matters in issue by his bill. If they are proper subjects for adjudication in this cause, it is by a decree between the co-defendants, and not by a decree in favor of the plaintiff against any of them. There is nothing in the decrees which have been rendered by the court, and which are only interlocutory, that can prevent the Circuit court from rendering any decrees between the co-defendants which it may be proper to-render in the cause; and indeed the said court in the decree appealed from, seems to have contemplated a future decree between the co-defendants by expressly reserving the questions raised by the exceptions to the-commissioner’s report, for future consideration and decision.
"We therefore think that the decree appealed from is-correct and ought to be affirmed, at least upon the merits. We are not satisfied, however, that the order prescribed by the report of the commissioner and the decree of the court for the sale of the lots held by William A. Alley, S. H. Fisher and M. M. Lipscomb, trustee, for his wife Adeline T. Lipscomb, respectively, is correct, although there is no exception to the report in that respect. That order is, that the lots held by said Alley shall be sold before the lots respectively held by said S. L. Fisher and M. M. Lipscomb, trustee; no doubt-upon the ground that the lots held by Alley were conveyed to him, after the lots held by S. H. Fisher and Lipscomb, trustee, respectively, were conveyed to B. W. Green, by A. D. Williams, trustee, under the deed of the'21st of February 1861; and that the inverse or *389 der of the subsequent alienations of incumbered property is the true order in which the property ought to be sold to satisfy the incumbrance. The principle is right, as has often been held by this court. Conrad v. Harrison, &c., 3 Leigh 532; McClung v. Beirne, 10 Id. 394; Rodgers v. McCluer's adm’r, &c., 4 Gratt. 81; and Henkle’s ex’x, &c. v. Allstadt, &c., Id. 284; by which cases the prior case of Beverley v. Brooke, 2 Leigh 425 has been overruled. But the application of the principle to this case seems not to be correct. It appears that the lots held by Alley and those held by S. D. Fisher and Lipscomb, trustee, respectively, were sold at the samé time, or on the same day, by A. D. "Williams, trustee, that is, on the 17th day of April 1863; and that the said holders claim the said lots respectively, directly or indirectly, under purchasers who purchased them at that sale and on that day. If this be so, then it would seem that these holders stand on an equality, and the lots held by them should bear the burden of Bogers’s incumbrance ratably, that is, in proportion to the prices at which they were respectively sold at the sale made by A. D. "Williams, as aforesaid. That these lots were conveyed by A. D. Williams to the purchasers at his sale, or their assigns, at different times, makes no difference. The rule of equality was fixed by the sale, and was not affected by the order of the conveyances, subsequently made by the vendor. 4 Gratt. 81, supra. We think that so much of the decree as directs a sale of the said lots held by said Alley, Fisher and Lipscomb, trustee as aforesaid, in the order mentioned in the report of commissioner Pleas-ants, ought to be reversed, and the said report ought to be recommitted to the commissioner, with instructions to make further enquiry, and report as to the order in which the said lots ought to be sold, if necessary, according to the principles set forth in the foregoing ■opinion. In all other respects we think the decree *390 ought to be affirmed, and with costs to the appellee Rogers, as the party substantially prevailing.
mi *» _ n -i-i The decree was as follows:
The court is of opinion, for reasons stated in writing,, and filed with the record, that the president, director» and company of the Farmers Bank of Virginia had no-authority to receive payment of the two protested negotiable notes in the proceedings mentioned in depreciated Confederate currency; that the payment made of said notes in such currency by A. D. "Williams in September 1863, as stated in his deposition,was avoid payment; that the said notes are still due and unpaid,, and belong to the appellee, B. F. Rogers; that the deed of trust of the 24th day of May 1859, from Benjamin W. Green to John G. Williams and Mortimer M. Young, is still a subsisting security, in full force and effect, for the payment of the said notes, except as to that portion of the property conveyed by said deed of trust, which was released by the deed of the 28th of August 1860, in the proceedings mentioned; that the said B. F. Rogers is entitled to have the said deed of trust enforced for the payment of said notes, with all interest and costs of protest due thereon, by a sale, if necessary, of the property conveyed by the said deed of trust, or so much thereof as may be sufficient for-the purpose, except as aforesaid; that he is entitled to -a decree for such a sale without being first required to-have any recourse against the president, directors and company of the Farmers Bank of Virginia, B. W. •Green, A. D. Williams, S. D. Fisher, G. ÍT. Gwathmey, or any other person; that if these parties, or any of them, can be made liable in this suit, as to which this court expresses no opinion, it must be by a decree between co-defendants, which decree, if proper, it will be competent for the Circuit court to make hereafter, as the decrees already made are interlocutory only, and *391 that there is no error m the said decrees already made, . , . at least upon the merits; but the court is oi opinion that there is error in so much of the decree of the day of March 1868 as prescribes the order of priority, in which the lots of land held by the purchasers respectively are to be sold for the 'satisfaction of the said debt due to B. F. Bogers. It appears that these lots were sold on the same day, to wit, the 17th day of April 1863, by A. D. Williams, trustee, though his conveyances of them were made afterwards and at different dates; and that the said holders respectively claim the said lots, directly .or indirectly, under purchasers who bought them at that sale and on that day. The court is therefore of opinion, that if it be not necessary to sell the whole of the land conveyed by the said deed of trust of the 24th day of May 1859, not released by the said deed of the 28th of August 1860, for the purpose of satisfying the said deed of trust, then the balance of the said debt due to B. F. Bogers, which may remain unsatisfied after applying to its payment the nett proceeds of the sale of the two lots still held by the said A. D. Williams, trustee, and directed to be first sold, ought to be raised ratably out of the lots now held by the said purchasers respectively, to wit: William A. Alley, Martin M. Lipscomb, trustee for his wife Adeline T. Lipscomb and S. D. Fisher, in proportion to the amounts of the purchase money for which those lots were respectively sold at the sale made by the said A. D. Williams, trustee, on the 17th day of April 1863 as aforesaid.
Therefore it is decreed and ordered, that so much of the said decree of the 11th day of March 1868, as is above declared to be erroneous, be reversed and annulled, and the residue thereof, and the decree of the 20th day of Bov ember 1867 affirmed; and that the appellee, B. F. Bogers, as the party substantially prevailing, do recover of the appellants his costs by him about "his *392 defence in this hehalf expended. And it is ordered that the cause be remanded to the said Circuit court for further proceedings to' be had therein in conformity with the foregoing opinion; which is ordered to be certified to the said Circuit court.
Decree reversed in part, but confirmed on the merits, with costs to the appellees.